UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH HINES, III,

        Petitioner,

v.                                                                     CASE NO. 10-13164
                                                                        HONORABLE GERALD E. ROSEN
CARMEN PALMER,

        Respondent.
_____/

## OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, BUT GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS*

Petitioner Joseph Hines, III, has filed a *pro se* habeas corpus petition challenging his

Wayne County convictions for murder and a firearm offense.  He alleges that his trial and

appellate attorneys were ineffective, that the prosecutor engaged in misconduct, and that the

cumulative effect of the prosecutor's errors deprived him of a fair and impartial trial.

Respondent argues that Petitioner's claims about the prosecutor, trial counsel, and appellate

counsel are procedurally defaulted and that Petitioner is not entitled to relief.  The Court agrees

that some of Petitioner's claims are procedurally defaulted and that none of the claims warrant

habeas relief.  Accordingly, the habeas petition is denied.  A procedural history and discussion

follow.

## I.  BACKGROUND

### A.  The Facts

Petitioner was charged with first-degree (felony) murder, second-degree murder, and

possession of a firearm during the commission of a felony (felony firearm).  The charges arose

from the fatal shooting of Darryl Adams in Inkster, Michigan on January 11, 2006.[1] Petitioner

was tried before a jury in Wayne County Circuit Court where the testimony established the

following facts.

<u>Kimberly McLain</u>

Kimberly McLain testified that, before Mr. Adams' death, she and Adams lived in a

house on Cherry Street in Inkster. Both of them used crack cocaine, and Adams sold drugs in

the house. For about two weeks before the shooting, Petitioner had been coming to their house

at least two times a day to buy "half tracks" of cocaine for $45.00.

On January 11, 2006, Petitioner came to their house and attempted to buy drugs for

$30.00. Adams had previously extended credit to Petitioner, but because Petitioner either did

not pay for the drugs or paid only part of the cost of the drugs, Adams said that he could not do it

this time. Petitioner left the house and returned about thirty or forty-five minutes later at

approximately 10:00 or 10:30 p.m.

Although Adams typically kept a cocked pistol in his hand when he answered the door,

his gun was in his pocket when Petitioner arrived the second time on January 11, 2006. Adams

admitted Petitioner and then walked into the dining room. He was standing at the dining room

table with his back to Petitioner when Petitioner, who was much larger than Adams, put his arms

around Adams and tried to hold down Adams' arms.

Adams normally was comfortable around Petitioner, but McLain concluded from the bear

hug that Petitioner was trying to rob Adams. Petitioner tried to reach in Adams' pocket and said,

"Give me that." Adams had his gun in his right pocket and drugs in his left front pocket. Adams

---

[1] Adams is also referred to as "Deryl Adams" in the state court record.

2

kept "half tracks" in orange M&M candy containers and "dying rocks" (smaller amounts of cocaine) in blue M&M containers.

Petitioner and Adams struggled as Adams tried to break lose from Petitioner's grip. McLain used her fist to hit Petitioner on the head. The two men continued to struggle and bumped into the television, which slammed into the wall and created a hole in the wall. The men ended up in the bedroom off the dining room. Adams' head hit the mirror on the dresser. He instructed McLain to get a trophy and hit Petitioner in the head. She tried that, but the trophy broke, and Petitioner did not let go of Adams. McLain also tried stabbing Petitioner with a scissors and hitting him in the head with a crystal bowl. Petitioner was wearing a quilted jacket and did not release Adams.

At some point, the gun came out of Adams' pocket. He gripped the barrel of the gun, and Petitioner gripped the handle of the gun. Petitioner threatened to shoot McLain if Adams did not tell her to get back. She ran upstairs and subsequently heard two gunshots. She looked down from the top of the stairs and saw Petitioner at the front door with an orange container and Adams' gun in his hand. He let himself out of the front door.

McLain then checked on Adams, who said that he had been shot. She did not call the 911 emergency operator because she was frightened and did not know what to do. She also feared that Adams might get in trouble with the police for selling drugs if she reported the shooting. The crack cocaine that she smoked about twenty minutes before the shooting may have clouded her judgment, but it did not prevent her from knowing what was happening. She called Adams' supplier who took Adams to the hospital.

At the hospital, she lied and told the police that Adams was shot outside. She changed

3

her statement when the police insinuated that she was the shooter and when they threatened to put her in jail if she did not tell the truth.  The second statement did not mention an outside shooting, but it also did not say anything about cocaine.  In her third and final statement to the police, she told the police what really happened because, by then, she knew that Adams was deceased.  Her final statement to the police was similar to her testimony in court, which was the truth.  She identified Petitioner in a set of photos which the police showed her.

Dr. Bader Cassim

Forensic pathologist Bader Cassim testified that Adams was 5'3" tall and 131 pounds at the time of the autopsy.  Although Adams had cocaine in his system, he died from massive bleeding caused by a gunshot wound to his abdomen.  The bullet entered from behind at close range, and the manner of death was homicide.

Maria Williams

Adams' daughter, Maria Williams, identified Adams' body at the hospital.  She stated that Adams was forty-nine years old at the time of his death.

Jeffrey Falkenstein

Detective Jeffrey Falkenstein of the Inkster Police Department testified that he interviewed Petitioner on January 19, 2006.  Petitioner's lips and mouth were not injured, cut, or healing from an injury, but some of his teeth were loose, and he said that he was feeling some pain from being struck in the face with the butt of a gun.  Petitioner denied having any cuts or lacerations on his lips or gums, and Detective Falkenstein saw no signs of trauma except for the missing teeth.

Petitioner referred to Adams as "Pistol Pete" because Adams always carried a revolver in

4

his pants and would hold the revolver in his hand when he answered his door.  Petitioner admitted to Falkenstein that, on January 11, 2006, he went to Adams' house to purchase four half balls of crack cocaine from Adams.  He told Adams what he wanted and, as he was looking down to count his money, Adams struck him in the mouth, knocking out one tooth and loosening three other teeth.   A struggle ensued over the gun.  Adams' girlfriend hit him in the back of the head and told him to let go of her man.  He bit Adams to make him release the gun, but when Adams dropped the gun, his girlfriend picked up the gun, pointed it at him, and told him to let go of her man.  He was holding Adams in front of himself, but Adams' girlfriend fired one time.  He was unsure whether the gunshot hit Adams.  He pushed Adams and his girlfriend down and ran out the door.

Petitioner denied shooting Adams and said that he was not a murderer.  He claimed that he did not report being assaulted during the incident because he did not want to get in trouble for the drug transaction.  Petitioner also said that Adams' girlfriend probably shot Adams and that it might have been  accidental.  But when Falkenstein asked Petitioner how the bullet could enter the right side of the victim and exit the left side if he and Adams were facing Adams' girlfriend, Petitioner stated that he did not know the answer to that question.

Falkenstein also asked Petitioner whether he had any issues with his mother.  Petitioner responded that he stole a book of checks from his mother because she owed him some money and would not repay him.

Falkenstein stated that he took pictures of Petitioner and looked inside Petitioner's mouth.  At the time, just one tooth was missing, and three other teeth were loose.

Detective Falkenstein did not recall telling Kimberly McLain that she was a suspect in

5

the case.  Instead, he thought that he had said she was implicated as a witness.

Brian Dennis

Detective Brian Dennis explained how he determined Petitioner's last name.  He also testified that Kimberly McLain ultimately informed the police that the incident occurred inside the house.  He went to the house and was able to able to see the front door clearly from the top of the stairs.  He thought that Dr. Cassim's report was consistent with what McLain had said.

Joseph Hines, III

Petitioner was thirty-three years old at trial.  He testified that he went to Adams' house on January 11, 2006, to buy four half balls of crack cocaine at $45.00 a piece.  He was friendly with Adams, and his normal procedure was to knock on the door, state what he wanted when Adams came to the door, get his product, and leave.  Adams always had his pistol out, and January 11 was no exception.  He told Adams what he needed and started counting his money as Adams walked to the dining room table.  Adams spun around and hit him in the mouth with the gun.  The blow damaged his teeth and ultimately caused him to lose four bottom teeth.  He thought that Adams was trying to kill him, rob him, or take something from him.  He was stunned, dropped everything, and lunged for Adams.  He pushed Adams against the table and chair and started biting him.  He felt his teeth folding in his mouth.

The two of them moved to the small room off the dining room and fell.  He started to lose his grip on Adams, but Adams stumbled backward.  He lunged at Adams again and got a hold of him.  At that point, the gun fired.  He let go of Adams as Adams went limp.  Then he ran out the door.  He got picked up by the police and talked to Detective Falkenstein about what happened.  He was frightened at the time and lied to the police when he said that Ms. McLain shot Adams.

6

On cross-examination, Petitioner denied having the intent to rob Adams, and he claimed that he was the victim. He stated that he had told his mother he did not do anything wrong and that his attorney had said it was manslaughter, at best, not second-degree murder.

Petitioner admitted that he stole some of his mother's checks and forged her name on them, but he denied taking the checks because of a drug problem. On re-direct examination, Petitioner stated that he was defending himself during the shooting incident.

<u>Stipulations, Rebuttal, and Closing Arguments</u>

The parties stipulated that Petitioner's statement to Detective Falkenstein was voluntary and freely given and that Falkenstein gave an accurate rendition of Petitioner's statement at trial. On rebuttal, the prosecutor played an audiotape of Petitioner's jailhouse conversation with his mother. During the conversation, Petitioner said that he was not going to worry because it was involuntary manslaughter, if anything, and not second-degree murder.

The prosecutor theorized during closing arguments that Petitioner went to Adams' house to buy crack cocaine and decided to rob him because he did not have money to pay for the cocaine. According to the prosecutor, Petitioner was guilty of both second-degree murder and felony murder (murder during the commission of a larceny), because Petitioner caused Adams' death and had one of three states of mind: intent to kill, intent to do great bodily harm, or intent to create a high risk of death or great bodily harm.

Defense counsel urged the jurors to find Petitioner not guilty on the basis that the prosecution did not carry its burden of proof beyond a reasonable doubt. Counsel stated that no unarmed person would attempt to rob an armed drug dealer and it was plausible that Adams wanted to take Petitioner's money because Adams had smoked his personal supply of crack

cocaine and needed more of it.  Defense counsel maintained that Kimberly McLain was not credible because she admitted to lying to the police.

On May 12, 2006, the jury found Petitioner guilty, as charged, of first-degree (felony) murder, Mich. Comp. Laws § 750.316(1)(b), second-degree murder, Mich. Comp. Laws § 75.317, and felony firearm, Mich. Comp. Laws § 750.227b.  The trial court sentenced Petitioner to two years in prison for the felony firearm conviction, followed by concurrent terms of life imprisonment for the first-degree murder conviction and thirty-five to seventy years for the second-degree murder conviction.

## B.  The Direct Appeal and State Collateral Proceedings

In an appeal as of right, Petitioner argued that:  (1) the trial court erred by admitting evidence of his telephone call to his mother; (2) his double-jeopardy rights were violated by his convictions for both second-degree murder and felony murder; (3) the trial court's bias and jury instructions effectively directed a verdict of guilty or shifted the burden of proof by removing a contested element from the jury's consideration; (4) the prosecutor engaged in misconduct by (a) telling the jury that defense counsel had tried to mislead them, (b) asking Petitioner to comment on the veracity of the prosecution's witnesses, and (c) appealing to the jury's sympathy;[2] and (5) trial counsel was ineffective for failing to object to the prosecutor's conduct.  The Michigan Court of Appeals vacated Petitioner's conviction and sentence for second-degree murder on double jeopardy grounds, but affirmed Petitioner's other convictions and sentences.  *See People v. Hines*, No. 271154 (Mich. Ct. App. Sept. 11, 2007) (unpublished).

---

[2] Petitioner also alleged that the cumulative effect of the prosecutor's errors deprived him of a fair trial.

Petitioner raised his evidentiary claim and his claims about the prosecutor and trial counsel in an application for leave to appeal in the state supreme court.  On January 22, 2008, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  *See People v. Hines,* 480 Mich. 1033; 743 N.W.2d 215 (2008) (table).

Petitioner subsequently filed a motion for relief from judgment in which he alleged that: (1) trial counsel was ineffective for failing to (a) prepare for trial, (b) investigate claims, (c) object to the prosecutor's misconduct, and (d) call witnesses; (2) the prosecutor engaged in misconduct by (a) submitting a photo of the defendant with conflicting dates and (b) failing to submit Petitioner's arrest photo instead of a photo from a prior arrest; (3) appellate counsel was ineffective for failing to raise meritorious issues on appeal; and (4) the cumulative effect of errors deprived him of a fair trial.  The trial court denied Petitioner's motion on grounds that (1) Petitioner's constitutional rights were protected, (2) he was afforded a fair trial and full appeal, and (3) he failed to show "good cause" for failing to raise his claims on direct appeal and "actual prejudice," as required by Michigan Court Rule 6.508(D)(3).  Petitioner appealed the trial court's decision, but the Michigan Court of Appeals denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D).  *See People v. Hines*, No. 294215 (Mich. Ct. App. Dec. 29, 2009) (unpublished).  On July 26, 2010, the Michigan Supreme Court denied leave to appeal for the same reason.  *See People v. Hines,* 487 Mich. 853; 785 N.W.2d 152 (2010) (table).

## C.  The Habeas Petition, Answer, and Reply Brief

Petitioner filed his habeas corpus petition on August 10, 2010.  The standardized petition lists four claims:  (1) Petitioner was denied due process and a fair trial by the admission of an

9

audiotape of a telephone conversation; (2) Petitioner's double-jeopardy rights were violated by multiple convictions for the same offense; (3) the trial court's bias and erroneous instructions shifted the burden of proof; and (4) Petitioner was denied his right to a fair trial by the prosecutor's misconduct.  Attached to the petition are several handwritten pages, which expand on Petitioner's prosecutorial-misconduct claim and also allege that trial and appellate counsel were ineffective and that Petitioner is actually innocent of the crimes for which he was convicted.      Respondent understands Petitioner's claims to allege (1) ineffective assistance of trial counsel, (2) prosecutorial misconduct, (3) ineffective assistance of appellate counsel, and (4)  cumulative effect of errors.  Petitioner appears to have adopted Respondent's summary of his claims, for his reply brief sets forth the following arguments and issues:

> I.      Petitioner was prejudiced because of trial counsel's fail[ure] to investigate a valid defense[;] fail[ure] to object to prejudicial actions by the prosecutor; [and] fail[ure] to call witnesses to support Petitioner's claim of self defense rendering ineffective assistance of counsel.

> II.     The petitioner was denied his rights to a fair and impartial trial when the prosecutor was allowed to present false and misleading evidence to the jury/withheld favorable evidence from the defense [in] violation of [a] discovery [order].

> III.    The cumulative effect of the prosecutorial errors clearly violated the petitioner's constitutional rights under both the Mich State Const. 1963 Art  1 #17 and the 5th [and] 14th Amends to a fair & impartial trial.

> IV.     Whether Petitioner Hines established ineffective assistan[ce] of appellate counsel during direct appeal in his motion for relief from judgment which showed a violation of [the] 14th Amendment holding in *Evitts v. Lucey*, 469 US 387; 105 S. Ct. 830; 83 L. ED 2d 821 (1985).

The Court assumes that Petitioner has abandoned any additional claims listed in his form

10

petition.[3]

---

[3]  The claims not addressed in Petitioner's reply brief allege that:  (1) the prosecution deprived Petitioner of due process and a fair trial by admitting evidence of Petitioner's taped telephone conversation with his mother; (2) Petitioner was convicted twice for the same offense in violation of his rights under the Double Jeopardy Clause; (3) he was denied a fair trial by jury instructions that shifted the burden of proof; and (4) Petitioner is actually innocent of the crimes for which he was convicted.  To the extent that Petitioner is still raising these issues, he is not entitled to habeas relief for the following reasons.

The Evidentiary Issue

The evidentiary issue lacks merit because state court rulings on the admissibility of evidence generally are not questioned on habeas corpus review.  *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000).  Furthermore, the state court's evidentiary ruling was not so fundamentally unfair as to warrant habeas relief.  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  The disputed evidence was an audiotape of Petitioner's telephone conversation with his mother while he was confined in jail.  Petitioner admitted on cross-examination by the prosecutor that he spoke with his mother about the crime and that he told her the crime was manslaughter at best and not second-degree murder.  (Trial Tr. vol. III, May 10, 2006, 23-24.) But he claimed that he made these comments to console his mother because she was sad and crying during the conversation.  (*Id.* at 25-26.)

On rebuttal, the prosecutor played a tape of Petitioner's jailhouse conversation with his mother.  The tape apparently demonstrated that Petitioner's mother was not crying or upset during the conversation.  The prosecutor used the tape to show that Petitioner had lied at trial about his mother's condition and about the reason for his comments to her during their taped conversation.  (*Id.* at 76.)

Although the Michigan Court of Appeals subsequently held that the recorded telephone conversation was not proper rebuttal evidence, the Court of Appeals stated that the trial court did not abuse its discretion by allowing part of the recorded conversation to be played at trial to impeach Petitioner's trial testimony.  The state court's interpretation of state law binds this Court, *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005), and because its ruling was not so fundamentally unfair as to violate due process, Petitioner has no right to relief on the basis of his evidentiary claim.

Double Jeopardy

Petitioner's double jeopardy claim is moot because the Michigan Court of Appeals vacated Petitioner's conviction and sentence for second-degree murder.  Petitioner is no longer being punished twice for the same murder.

## II.  DISCUSSION

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*,  __ U.S. __, __, 131 S. Ct. 770, 783 (2011).  Pursuant to § 2254, state prisoners are not entitled to the writ of habeas corpus unless the state court's adjudication of their claims on the merits

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

---

### The Trial Court

Petitioner's claim about the trial court's alleged bias and erroneous jury instructions lacks merit because Petitioner has not supported his claim with any facts or citations to the record. Conclusory claims do not satisfy federal notice pleading requirements, *Hall v. Beast*, 116 F. App'x 557, 559 (6th Cir. 2004), and are insufficient to state a constitutional claim and warrant habeas relief.  *Wogenstahl v. Mitchell*,  668 F.3d 307, 335-36 (6th Cir.), *cert. denied sub nom Wogenstahl v. Robinson*, __ U.S. __, 133 S. Ct. 311 (2012).

### Actual Innocence

Petitioner alleges that he is actually innocent of the crimes for which he was convicted. The Court rejects this claim because "a claim of 'actual innocence' is not itself a constitutional claim" for which habeas relief may be granted.  *Herrera v. Collins*, 506 U.S. 390, 404 (1993). Even if a claim of innocence were cognizable on habeas relief, the Supreme Court has "described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'"  *House v. Bell*, 547 U.S. 518, 555 (2006) (quoting *Herrera*, 506 U.S. at 417).  A claim of innocence requires showing that, in light of some new evidence, "more likely than not any reasonable juror would have reasonable doubt."  *Id*. at 538.

The evidence against Petitioner at trial was substantial, and he has not submitted any new and reliable evidence which establishes his innocence by a more-likely-than-not standard. Consequently, he is not entitled to the writ of habeas corpus on the basis of his claim of actual innocence.

State court proceeding.

28 U.S.C. § 2254(d).

## A.  Procedural Default

Respondent argues that the state trial court's decision on Petitioner's claims was objectively reasonable and that Petitioner's claims about trial and appellate counsel and the prosecutor are procedurally defaulted.  A procedural default is "a critical failure to comply with state procedural law."  *Trest v. Cain*, 522 U.S. 87, 89 (1997).  The doctrine of procedural default prohibits a federal court from reviewing the merits of a petitioner's claims, including constitutional claims, if the state court declined to hear the claims because the prisoner failed to abide by a state procedural rule.  *Martinez v. Ryan*, __ U.S. __, __, 132 S. Ct. 1309, 1316 (2012).  Three elements must be satisfied before a claim may be considered procedurally defaulted:  "(1) the petitioner failed to comply with a state procedural rule that is applicable to the petitioner's claim; (2) the state courts actually enforced the procedural rule in the petitioner's case; and (3) the procedural forfeiture is an 'adequate and independent' state ground foreclosing review of a federal constitutional claim."  *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003).

The state procedural rule applicable here is Michigan Court Rule 6.508(D), which reads in relevant part:

> **(D) Entitlement to Relief.**  The defendant has the burden of establishing entitlement to the relief requested.  The court may not grant relief to the defendant if the motion
>
> . . . .
>
> (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence . . . unless the defendant demonstrates

(a) good cause for failure to raise such
grounds on appeal . . . , and

(b) actual prejudice from the alleged
irregularities that support the claim for relief.

Mich. Ct. R. 6.508(D)(3).

Petitioner violated Rule 6.508(D)(3) by failing to raise his claims about the prosecutor,

trial counsel, and the cumulative effect of errors on direct appeal and by asserting the claims for

the first time in his motion for relief from judgment and subsequent appeals.[4]  Thus, the first

element of procedural default (failure to comply with an applicable state procedural rule) is

satisfied.

The second element of procedural default (enforcement of the rule) also is satisfied,

because the last state court to issue a reasoned opinion on Petitioner's claims relied on Rule

6.508(D)(3) to deny relief. The trial court stated in its order denying Petitioner's motion for

relief from judgment that Petitioner failed to show "good cause" under Rule 6.508(D)(3) and

actual prejudice.[5]  The fact that the trial court also found Petitioner's claims to lack merit does

---

[4] Petitioner's claim about appellate counsel is not procedurally defaulted because
Petitioner could not be expected to raise a claim about his appellate counsel while he was
represented by the attorney.  His motion for relief from judgment was the first time he could
raise that claim.  *Whiting v. Burt*, 395 F.3d 602, 610 n.6 (6th Cir. 2005); *Hicks v.  Straub*, 377
F.3d 538, 558 n.17 (6th Cir. 2004); *McFarland v. Yukins*, 356 F.3d 688, 713 (6th Cir. 2004).

The other claims are procedurally defaulted, however, because he did not raise them on
direct appeal.  Although Petitioner raised claims about the prosecutor, trial counsel, and the
cumulative effect of errors on direct appeal, the underlying grounds for those claims were
different from the grounds for Petitioner's current claims.

[5] After *Guilmette v. Howes*, 624 F.3d 286 (6th Cir. 2010), the brief state appellate court
orders citing Rule 6.508(D) "are no longer a sufficient basis for a finding of procedural default.
Instead, [the Court] must look to the last reasoned state court opinion, which in this case is the
trial court's denial of [Petitioner's] motion for relief from judgment, to determine if the court

14

not preclude a finding that the court relied on a procedural default to deny relief.  *See Harris v.*

*Reed*, 489 U.S. 255, 264 n.10 (1989) (stating that "a state court need not fear reaching the merits

of a federal claim in an *alternative* holding.  By its very definition, the adequate and independent

state ground doctrine requires the federal court to honor a state holding that is a sufficient basis

for the state court's judgment, even when the state court also relies on federal law."); *see also*

*Johnson v. Sherry*, 586 F.3d 439, 445 n.3 (6th Cir. 2009) (noting that the procedural-default rule

applies when the state court discusses the merits of a prosecutor's claim on an alternative basis).

The third element of procedural default concerns the adequacy and independence of the

state procedural rule in question.  "To qualify as an 'adequate' procedural ground, a state rule

must be 'firmly established and regularly followed.'"  *Walker v. Martin*, __ U.S. __, __, 131 S.

Ct. 1120, 1127 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, __, 130 S.Ct. 612, 618 (2009)).

Rule 6.508(D) has been firmly established and regularly followed since it was enacted in 1989,

and the Court of Appeals for the Sixth Circuit considers the rule to be "an independent and

adequate state ground" for procedural-default purposes.  *Amos v. Renico*, 683 F.3d at 733.

Therefore, the third element of procedural default is satisfied.

To summarize, all three elements of procedural default are satisfied.  Petitioner violated a

state procedural rule, the state trial court enforced the rule, and the rule was an adequate and

independent state ground, requiring Petitioner to raise his claims during his direct appeal.

Consequently, his claims about the prosecutor, trial counsel, and the cumulative effect of errors

are procedurally defaulted unless he can show "cause for [his] default and actual prejudice as a

_____

dismissed [Petitioner's] claim[s] on procedural grounds."  *Amos v. Renico*, 683 F.3d 720, 727
(6th Cir.) (citing *Guilmette*, 624 F.3d at 291), *cert. denied*, __ U.S. __, 133 S. Ct. 664 (2012).

result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## B.  "Cause" for the Procedural Default

Petitioner alleges that his appellate attorney was the "cause" for his failure to raise his claims on direct appeal.  The trial court concluded on review of Petitioner's claim about appellate counsel that Petitioner's argument failed because he could not show any prejudice from appellate counsel's decisions.

The Sixth Circuit Court of Appeals has stated that "[f]ailure of appellate counsel to raise an issue on appeal can amount to constitutionally ineffective assistance," *Jalowiec v. Bradshaw*, 657 F.3d 293, 321 (6th Cir. 2011) (citing *McFarland v. Yukins*, 356 F.3d at 710), *cert. denied*, __ U.S. __, 133 S. Ct. 107 (2012), and that "[I]neffective assistance of appellate counsel can constitute cause to excuse a procedural default."  *Hoffner v. Bradshaw*, 622 F.3d 487, 499 (6th Cir. 2010) (citing *Murray v. Carrier*, 477 U.S. 478, 492 (1986), and *Howard v. Bouchard*, 405 F.3d 459, 478 (6th Cir. 2005)), *cert. denied*, __ U.S. __, 131 S. Ct. 2117 (2011).  But to demonstrate that appellate counsel was ineffective, Petitioner must show (1) that his attorney was objectively unreasonable in failing to raise his issues on appeal and (2) a reasonable probability that he would have prevailed on appeal were it not for his attorney's failure to raise the issues.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 687-91, 694 (1984)); *Moore v. Mitchell*, __ F.3d __, __, Nos. 08-3167/3230, slip op. at 33 (6th Cir. Feb. 26, 2013).  The Court will proceed to analyze Petitioner's claims to determine whether appellate counsel was ineffective for failing to raise those claims on direct appeal.

16

### 1. The Prosecutor

Petitioner contends that the prosecutor deprived him of a fair and impartial trial by presenting false and misleading evidence to the jury, by violating a discovery order and withholding favorable evidence, and by introducing "bad acts" evidence. The trial court rejected these claims on the basis that the alleged prosecutorial misconduct did not prevent Petitioner from having a fair trial.

### a. Reliance on Allegedly False and Misleading Evidence

Petitioner alleges that the prosecutor relied on false and misleading evidence and allowed false testimony about the evidence to go uncorrected. The disputed evidence is a photograph of Petitioner. According to Petitioner, the photograph was taken in 2003, but the prosecutor "blacked out" the date 2003 at the bottom of the photograph and did not correct Detective Falkenstein when Falkenstein testified that he took the photograph at Petitioner's arrest in January of 2006. Petitioner's mouth apparently looked normal in the photograph and did not support his claim that the deceased victim injured him by hitting him in the mouth with a gun. Petitioner concludes from these facts that the prosecutor relied on misleading evidence and allowed Detective Falkenstein's false testimony to go uncorrected.

Prosecutors may not misrepresent the facts in evidence, *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000), nor present false evidence and allow false testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153 (1972). But to prevail on a claim that the prosecutor relied on false testimony, a defendant must show that (1) the testimony was actually false, (2) the false statements were material, and (3) the prosecutor knew the testimony was false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*,

890 F.2d 817, 822 (6th Cir. 1989)).

The record indicates that Kimberly McLain was shown some photographs within a day or two of the crime and that she identified Petitioner's photograph in the array.  This photograph was labeled People's exhibit three ("Lineup photo").  Defense counsel had no objection to the photograph, and it was received in evidence.  (Trial Tr. Vol. II, May 9, 2006, 2, 70-71.)

Detective Falkenstein testified that he interviewed Petitioner and took photographs of him on January 19, 2006.  He claimed that the photographs depicted how Petitioner looked then.  One of these photographs was labeled People's exhibit six ("Booking photo"), and it was received in evidence without objection from defense counsel.  (*Id.* at 2, 162, 184-85.)

Petitioner has not submitted the photograph that supposedly had the date 2003 "blacked out."  Nor has he submitted any booking photographs that support his claim of being injured in 2006 during the altercation with Darryl Adams.  In fact, Petitioner has not submitted any supplemental materials to support his claim that Detective Falkenstein perjured himself and that the prosecutor relied on false evidence.  Consequently, there is no basis for concluding that Detective Falkenstein perjured himself when he testified that the booking photograph depicted how Petitioner looked at his arrest in 2006 and that Petitioner's gums, lips, and mouth were not cut or injured.  Petitioner himself informed Detective Falkenstein that he did not have any cuts or lacerations on his lips or gums as a result of being struck by Adams.  (Trial Tr. Vol. II, May 9, 2006, 181.)  The contention that the prosecutor relied on false evidence or allowed false testimony to go uncorrected is conclusory and unsupported.  Therefore, appellate counsel was not ineffective for failing to raise this prosecutorial-misconduct issue on appeal.  Furthermore, "[c]onclusory allegations, without evidentiary support, do not provide a basis for habeas relief."

18

*Prince v. Straub*, 78 F. App'x 440, 442 (6th Cir. 2003) (citing *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 301 (3d Cir. 1991)).

### b.  The Audiotape

Petitioner alleges that the prosecutor violated a discovery order by not promptly producing an audiotape of the telephone conversation that Petitioner had with his mother while he was confined in jail.  Petitioner admitted at trial that he had the conversation with his mother, but he testified that his mother was upset and that he had tried to console her by telling her that, according to his attorney, the crime was really a case of manslaughter, not murder.  (Trial Tr. Vol. III, May 10, 2006, 23-26.)

On rebuttal, the prosecutor played the following excerpt of the taped conversation for the jury:

> MR. HINES:  I can get around that[] but he said it's going to be what it's going to be.  But I know it's not going to be no second degree murder and it's not like no, you know, like I said at best it's involuntary manslaughter if it's anything.
>
> THE PERSON CALLED:  Um hum.
>
> MR. HINES:  So.
>
> THE PERSON CALLED:  Okay.
>
> MR. HINES:  So like I said I'm not going to worry about it.  Have you talked to Niecey lately?
>
> THE PERSON CALLED:  What did you say?
>
> MR. HINES:  I said have you talked to Niecey lately?
>
> THE PERSON CALLED:  Not lately she had been calling but um.
>
> MR. HINES:  Inaudible.

(*Id*. at 59.)

19

Petitioner alleges that the prosecutor violated the trial court's discovery order by not producing the audiotape of this conversation until the second day of trial. Petitioner also alleges that the prosecutor violated the holding of *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding the audiotape and then altering it to make it appear as though he said, "I can get around this." Petitioner contends that this statement does not appear in the transcript of the tape and that the voice on the tape is not his.

"Under *Brady*, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, __ U.S. __, __, 132 S. Ct. 627, 630 (2012). Petitioner bears the burden of showing that the prosecution suppressed evidence. *Bell v. Howes*, 703 F.3d 848, 853 (6th Cir. 2012) (citing *United States v. Warshak*, 631 F.3d 266, 300 (6th Cir. 2010)). To state a true *Brady* violation, he must demonstrate that (1) the evidence at issue was favorable to him, either because it was exculpatory or impeaching, (2) the State suppressed the evidence, either willfully or inadvertently, and (3) prejudice ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Petitioner has not provided the Court with any evidence demonstrating that the prosecutor either altered the audiotape of his conversation with his mother or withheld a different version of the taped conversation. In fact, the prosecutor stated at trial that she had put defense counsel on notice that she might use the audiotape on rebuttal and that defense counsel was "fully aware" of what was on the tape. (Trial Tr. Vol. III, May 10, 2006, 8.) Although defense counsel objected to the evidence on grounds that it was hearsay and required him to testify about what he really said to Petitioner, there is no indication in the record that defense counsel thought the prosecution was withholding favorable evidence or had altered the audiotape which was

20

played for the jury.  (*Id*. at 8, 25, 52-60.)  Petitioner therefore has failed to establish a true *Brady*

claim by showing that the prosecutor suppressed evidence favorable to the defense, and appellate

counsel was not ineffective for failing to raise this issue on appeal.

Furthermore, the contention that the prosecutor violated a state discovery order is not a

cognizable claim on habeas corpus review.  *Colston v. Burke*, 37 F. App'x 122, 125 (6th Cir.

2002).  Therefore, Petitioner would not be entitled to relief even if this aspect of his claim were

not procedurally defaulted.

### c.  Other "Bad Acts" Evidence

Petitioner faults the prosecutor for cross-examining him about cashing one of his

mother's checks.  Petitioner contends that the evidence was irrelevant and prejudicial, because

the prosecutor made it appear that he stole the checks from his mother to purchase drugs even

though he was never charged with a crime in connection with the checks.

While it is true that the prosecutor asked Petitioner whether he stole his mother's checks

to pay for his drug habit, Petitioner denied stealing the checks as a result of a drug problem.

(Trial Tr. Vol. III, May 10, 2006, 22).  The issue, moreover, arose earlier in the trial when

Detective Falkenstein testified about his interview with Petitioner.  Falkenstein stated that he had

asked Petitioner whether he had any issues with his mother.  According to Falkenstein, Petitioner

had answered, "Yes," and then explained that he stole a book of his mother's checks because she

owed him some money and would not repay him.  Petitioner also informed Falkenstein that the

Romulus Police Department was handling the incident.  (Trial Tr. Vol. II, May 9, 2006, 181-82.)

In light of Detective Falkenstein's testimony, the prosecutor's subsequent questions to Petitioner

were not so unfair as to deprive Petitioner of a fair trial, and appellate counsel was not

21

ineffective for failing to raise this claim on direct appeal.

Even if this claim were not procedurally defaulted,

[t]here is no clearly established Supreme Court precedent which holds that a state
violates due process by permitting propensity evidence in the form of other bad
acts evidence . . . .  While the Supreme Court has addressed whether prior acts
testimony is permissible under the Federal Rules of Evidence, *see Old Chief v.
United States*, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed.2d 574 (1997); *Huddleston
v. United States*, 485 U.S. 681, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988), it has
not explicitly addressed the issue in constitutional terms.

*Bugh v. Mitchell*, 329 F.3d at 512-13.  Petitioner's disagreement with the state court's ruling on

"other acts" evidence involves no constitutional dimension and, therefore, is not cognizable on

federal habeas review.  *Bey v. Bagley*, 500 F.3d 514, 523 (6th Cir. 2007).

### d.  The Cumulative Effect of Errors

Petitioner alleges that the cumulative effect of the prosecutor's errors violated his right to

a fair trial under the state and federal constitutions.  The trial court stated on review of this claim

that Petitioner had not established any error and that there was no cumulative effect of errors

meriting reversal.  This Court agrees and concludes that appellate counsel was not ineffective for

failing to raise this issue on appeal.

Furthermore, a claim that the cumulative effect of errors rendered a petitioner's trial

fundamentally unfair is not cognizable on habeas review.  *Sheppard v. Bagley*, 657 F.3d 338,

348 (6th Cir. 2011) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)), *cert. denied sub

nom Sheppard v. Robinson*, __ U.S. __, 132 S. Ct. 2751 (2012).  Therefore, even if Petitioner's

claim about the cumulative effect of the prosecutor's errors were not procedurally defaulted,

Petitioner would have no right to relief on the basis of his claim.

### 2.  Trial Counsel

22

The Court understands Petitioner to be alleging that his trial attorney was ineffective for failing to consult with him, to investigate a valid defense, and to call witnesses.  Petitioner further alleges that trial counsel was ineffective for failing to object to the prosecutor's violation of a discovery order and direct examination of Detective Falkenstein.

The trial court stated on review of these claims that counsel's performance did not fall below an objective standard of reasonableness and that Petitioner was not prejudiced by his attorney's alleged deficiencies.  The trial court also was not persuaded that counsel failed to function as the counsel guaranteed to Petitioner by the Sixth Amendment.

An attorney is constitutionally ineffective if the attorney's "performance was deficient" and "the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. at 687.  The "deficient performance" prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  The prejudice prong requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  "The likelihood of a different result must be substantial, not just conceivable."  *Harrington v. Richter*, 131 S. Ct. at 792 (quoting *Strickland v. Washington*, 466 U.S. at 693).

### a.  Failure to Consult, Investigate, and Call Witnesses

Petitioner alleges that his attorney was suspended from the practice of law for thirty days before Petitioner's trial and that counsel failed to consult with him except for about six minutes before the preliminary examination.  This claim fails because Petitioner has not shown any prejudice as a result of his attorney's suspension from the practice of law and failure to spend more time consulting with him.

23

Petitioner also states that he asked his trial attorney to speak with his father, who was present at his arrest, and with his dentist, who removed his damaged teeth from his mouth. According to Petitioner, these two witnesses would have been able to testify that Petitioner's mouth was badly damaged from being hit with a foreign object. Petitioner contends that this testimony would have supported his theory that he was defending himself from an attack during the incident with Darryl Adams.

Attorneys have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington*, 466 U.S. at 691. The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "[T]he failure to interview key defense witnesses is objectively unreasonable in light of *Strickland*." *Poindexter v. Booker*, 301 F. App'x 522, 528 (6th Cir. 2008). The relevant question is whether counsel's choices were reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000) (citing *Strickland v. Washington*, 466 U.S. at 688). Attorneys "may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005)

Petitioner's father and dentist might have been able to testify about the condition of Petitioner's mouth and teeth and what Petitioner told them about his missing or loose teeth. They might even have been able to speculate that Petitioner was hit in the mouth with a hard object. But because neither one was present at the shooting, they would not have been able to

24

say whether Adams hit Petitioner or whether Petitioner acted in self defense.  Therefore, defense counsel's performance was not deficient as a result of failing to interview or call Petitioner's father and dentist as witnesses.  The Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

The allegedly deficient performance also did not prejudice the defense, because both Petitioner and Detective Falkenstein testified that Petitioner's teeth were missing or loose.  (Trial Tr. Vol. II, May 9, 2006, 170, 179, 185-86 (Detective Falkenstein's testimony); Trial Tr. Vol. III, May 10, 2006, 14, 26-27) (Petitioner's testimony)).  Falkenstein, moreover, testified that Petitioner's mouth was not injured or bleeding and that Petitioner himself had admitted during his interview with Falkenstein that his mouth was not injured.  (Trial Tr. Vol. II, May 9, 2006, 170-71, 181.)  Given this testimony, it is unlikely that the result of the trial would have been different had defense counsel produced Petitioner's father and dentist as witnesses.

### b.  Failure to Object to the Prosecutor's Conduct

Petitioner alleges that trial counsel was ineffective for allowing the prosecutor to question Detective Falkenstein about the condition of Petitioner's mouth and for not objecting to Falkenstein's testimony that a photograph of Petitioner depicted how he looked at his arrest. According to Petitioner, the picture was taken of him on November 1, 2003, and did not reflect the condition of his mouth on January of 2006 when he was arrested.  As explained above, however, the record does not support Petitioner's allegation that a photograph taken in 2003 was falsely identified at trial as one of the photographs taken of Petitioner at the time of his arrest. Defense counsel, therefore, was not ineffective for failing to object to the prosecutor's questions

about the booking photographs and the condition of Petitioner's mouth.

Petitioner also contends that defense counsel was ineffective for failing to exclude the audiotape of his jailhouse telephone conversation during which he stated to his mother that the case was manslaughter at best and not murder. Petitioner asserts that defense counsel should have requested a continuance so that the recording could be authenticated. In the alternative, Petitioner states that defense counsel should have moved to exclude the recording on the ground that the prosecutor violated a discovery order to produce the tape.

Defense counsel did object when the prosecutor sought permission to introduce the tape on rebuttal, but the trial court overruled his objection. And because there is no evidence in the record to support the contention that the prosecutor tampered with the audiotape, it is unlikely that the trial court would have granted a continuance for the purpose of authenticating the tape. It is also unlikely that the trial court would have prevented the prosecutor from playing an excerpt from the audiotape if defense counsel had objected on the basis of the prosecutor's untimely compliance with a discovery order. Defense counsel's handling of the issue was adequate, and the allegedly deficient performance did not prejudice the defense.

### 3. Conclusion on "Cause"

The Court concludes for all the reasons given above that Petitioner's claims about the prosecutor and trial counsel lack merit and, therefore, appellate attorney was not ineffective for failing to raise those claims on direct appeal. "Appellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'" *Shaneburger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)), *cert. denied*, __ U.S. __, 131 S. Ct. 1013 (2011). And because appellate counsel was not ineffective,

26

Petitioner has not established "cause" for his failure to raise his claims about the prosecutor, trial counsel, and the cumulative effect of errors on direct appeal.  *See Hoffner v. Bradshaw*, 622 F.3d at 499 (stating that appellate counsel's failure to raise "guilt-phase ineffective-assistance claims does not establish cause to excuse the default . . . because the underlying claims are meritless").

## C.  "Prejudice" and Miscarriage of Justice

"The cause-and-prejudice analysis is a conjunctive one, requiring a petitioner to satisfy both prongs to excuse a procedural default."  *Matthews v. Ishee*,  486 F.3d 883, 891 (6th Cir. 2007).  Because Petitioner not shown cause for his procedural default, the Court need not address whether he has satisfied the prejudice prong.  *Id.* (citing *Broom v. Mitchell*, 441 F.3d 392, 405 (6th Cir. 2006)); *Tolliver v. Sheets*, 594 F.3d 900, 930 n. 13(6th Cir. 2010).

The remaining issue is whether the Court's failure to review the substantive merits of Petitioner's defaulted claims will result in a fundamental miscarriage of justice.  *Coleman v. Thompson*, 501 U.S. at 750.  The miscarriage-of-justice exception "is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons."  *Herrera v. Collins*, 506 U.S. at 404.  Thus, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."  *Murray v. Carrier*,  477 U.S. 478, 496 (1986).  To demonstrate actual innocence, however, Petitioner must show that, in light of some new evidence, no reasonable juror "would have voted to find him guilty beyond a reasonable doubt."  *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

Petitioner has not produced any new evidence of actual innocence.  Therefore, a

27

miscarriage of justice will not result from the Court's failure to address the substantive merits of

his claims about the prosecutor and trial counsel.

## IV.  CONCLUSION

Petitioner's claims are procedurally defaulted, and the state court's limited review of

Petitioner's claims was objectively reasonable.  Accordingly, the petition for writ of habeas

corpus is **DENIED**.

## V.  CERTIFICATE OF APPEALABILITY

Before Petitioner may appeal this decision, a certificate of appealability must issue.  28

U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only

if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

§ 2253(c)(2).

> Where a district court has rejected the constitutional claims on the merits,
> the showing required to satisfy § 2253(c) is straightforward: The petitioner must
> demonstrate that reasonable jurists would find the district court's assessment of
> the constitutional claims debatable or wrong. . . .   When the district court denies a
> habeas petition on procedural grounds without reaching the prisoner's underlying
> constitutional claim, a [certificate of appealability] should issue when the prisoner
> shows, at least, that jurists of reason would find it debatable whether the petition
> states a valid claim of the denial of a constitutional right and that jurists of reason
> would find it debatable whether the district court was correct in its procedural
> ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Reasonable jurists would not find the Court's procedural ruling debatable, nor find it

debatable whether the petition states a valid claim of the denial of a constitutional right.  And to

the extent that the Court has rejected some of Petitioner's claims on the merits, reasonable jurists

would not find the Court's assessment of the constitutional claims debatable or wrong.  The

Court therefore declines to issue a certificate of appealability.  Petitioner nevertheless may

proceed *in forma pauperis* on appeal if he chooses to appeal this decision, because an appeal could be taken in good faith.  28 U.S.C. § 1915(a)(3).


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  March 6, 2013

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 6, 2013, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager